Morrison v. Murphy.

---

JOHNSON MORRISON, Appellant, v. CATHERINE MURPHY, Executrix, Respondent.

St. Louis Court of Appeals, April 16, 1889.

1. **Partnership: EVIDENCE: INCONGRUITIES.** The plaintiff sued as assignee of one who claimed to have been a partner of the defendant's testator, in his lifetime, demanding an accounting and settlement of the partnership affairs and a judgment for an alleged balance due to the assignor as surviving partner. It appeared in evidence that the said assignor and surviving parter was, at the same time, trustee of the estate of a married woman, and that the only business of the alleged partnership was the building of three houses for the trustee's *cestui que trust*. Besides this irregularity of the trustee's contracting with himself as a member of a building firm, the evidence for the plaintiff so abounded in incongruities and incredible statements of fact, that it could not reasonably be taken to authorize a judgment, as prayed for. The referee found, as a conclusion of fact, that no partnership had ever existed, as alleged, and the court approved his report. *Held:* The approval of the report was justified by the unsatisfactory state of the plaintiff's evidence, and the petition was properly dismissed.

2. **Witness:** INTEREST IN CONTROVERSY: SURPRISE. Where a witness for the plaintiff was permitted to testify before the referee, solely upon the faith of his own sworn allegation that he had no interest in the result of the litigation, and it afterwards appeared from the plaintiff's testimony that the witness did have such an interest, whereupon the referee finally ruled out the testimony given by the witness, the plaintiff has no right to complain that he was surprised by such ruling, and that, but for the previous action of the referee, he could have introduced other testimony to the like effect as that which was excluded.

*Per Thompson, J., concurring.*

3. **Jurisdiction:** CHARGE AGAINST DECEASED PARTNER'S ESTATE The subject-matter of a charge against the estate of a deceased partner in the hands of his legal representative belongs exclusively to the original jurisdiction of the probate court. The circuit court had, therefore, no jurisdiction of this cause, and the same was properly dismissed.

*Appeal from the St. Louis City Circuit Court.*—HON. GEORGE W. LUBKE, Judge.

AFFIRMED.

*Smith & Harrison,* for the appellant.

On the hearing, the referee held that Reilly was a competent witness. Reilly was examined thoroughly as to the issue of partnership. The referee did not, either during the hearing, nor when the cause was submitted to him, suggest or intimate any change of his views on that question. The action of the referee, by which he excluded all of the testimony of Reilly, operated as a surprise on the plaintiff. Ordinary prudence could have afforded no protection to plaintiff against the act of the referee in finally excluding the testimony of Reilly as incompetent. It could not have been foreseen, as his testimony was admitted as competent and so treated by the referee until his final report. Other testimony could have been adduced on the question of partnership had the plaintiff known or had any

intimation that Reilly's testimony would be excluded. The finding of the referee on the issue of partnership was erroneous. That Reilly and Murphy were to share in the profits of building the three houses, is clearly established by the witnesses Redmond and McGinley, and by the conduct of the parties themselves. The paper introduced by defendant wherein B. J. Reilly is named as trustee for Julia Rogers cuts no figure. It was a trust which ceased to exist. No contract between Murphy and Rogers was made under or by virtue of the paper creating such trust. It was entirely distinct from any relation of trust or confidence, and arrangement between Murphy and Reilly was made before that paper was signed.

*A. R. Taylor*, for the respondent.

The evidence for the plaintiff and the flagrantly untruthful conduct and deportment of each witness for the plaintiff, without a word for the defense, justify the trial court's action. The mother and daughter by the election of plaintiff's counsel were made competent witnesses, as to deceased's statements, and they entirely disprove the alleged partnership, and show that Reilly was nothing but a factotum for Murphy and was paid for his services years before Murphy's death. But the monumental fact in the case is that Reilly is a slick, shrewd man of affairs, wrestling with poverty, and dodging his creditors, should stand silently by for three years and a half after the completion of the contract, and silently await the slowly approaching death of Murphy, knowing all the time that he had not a single mark from Murphy to corroborate his preposterous claim. But Reilly could not in equity be heard to assert that he was a silent partner in this contract. He was the trustee of Mrs. Rogers in making the contract with Murphy. How can he, with (if his theory is to be

believed) his dirty hands, be heard in a court of equity to assert a claim to the fruit of his inequitable bet in making a contract, as trustee of Julia Rogers, with himself, as parter of Bernard Murphy? *In pari delicto potior est conditio defendentis et possidentis* is a maxim of the law that stifles the aspiration of the plaintiff. Here Reilly alone was in the wrong, on his own pretense. *Turley v. Edwards*, 18 Mo. App. and cas. cit. If Reilly's theory were true he would not be allowed to claim the fruit of his fraud but the wronged *cestui que trust*. The referee was entirely justified in ruling out Reilly's evidence. *Meier v. Thieman*, 90 Mo. 443–444.

BIGGS, J., delivered the opinion of the court.

On the nineteenth day of March, 1887, this suit was begun. Plaintiff, in his petition, alleged that one Bernard J. Reilly, and the deceased, B. Murphy, in the year 1882, entered into a co-partnership for the purpose of building three houses on Finney avenue, in the city of St. Louis, for Mrs. Julia Rogers and Dr. Patrick Rogers, her husband. That in the prosecution of the business of the firm, Reilly was to furnish the experience and skill, and Murphy was to furnish the necessary funds for carrying on the business, and the profits of the venture (if any) were to be divided equally. That the firm commenced work on the buildings in the fall of 1882, and completed them in May, 1883. That the buildings were erected by said firm at an actual outlay of $11,500. That the firm received from Mr. and Mrs. Rogers for the work, the sum of $8,750 in money, and a deed to a lot situated on Seventeenth street, near Cass avenue in said city. That the title to this property was taken in the name of Murphy, and that the latter agreed to hold it in trust for the firm. That, afterwards, Murphy exchanged this property with one Kerrigan for two hundred and twenty-five front feet of ground on Finney avenue, and received from Kerrigan the sum of one thousand dollars, the difference in the

value of the property so exchanged, and that Murphy also agreed to hold the Finney avenue property in trust for the firm. That, in January, 1885, Murphy sold one hundred feet of the Finney avenue property for three thousand dollars, and on the tenth day of April, 1885, he also sold twenty-five feet of the same for seven hundred and fifty dollars, making the total cash receipts, by Murphy, on account of this contract, the sum of $13,500. That Murphy, at the time of his death, to-wit, August 30, 1886, held the title to the remaining one hundred feet in trust for the firm. That Murphy only paid to Reilly on account of his share, of the profits the sum of five hundred dollars. That the one hundred feet of ground, remaining undisposed of and belonging to the firm, was worth thirty-five hundred dollars. That there had been no adjustment or settlement of the business of said firm and that the amount of the profits arising from the business of the co-partnership to which Reilly was entitled, at the time of Murphy's death, was the sum of two thousand dollars. That on the fifteenth day of December, 1886, Reilly transferred to plaintiff his interest in said firm.

Plaintiff asked for an accounting of the business of the firm, and that a decree be entered in plaintiff's favor and against the estate of the deceased for Reilly's share of the profits and for other relief.

The defendant filed an answer denying all of the allegations in plaintiff's bill.

On the thirty-first of May, 1887, Charles A. Davis, Esq., was, by the circuit court, appointed referee, and by order of court, was directed to "try all issues and report to the court, with all convenient speed ; but the court doth direct and instruct the said referee that if he find the question of partnership adverse to the plaintiff, he shall so report to the court and not take an account between the parties."

In compliance with this order of court, the referee began taking testimony on the seventh day of June,

1887, and concluded the proceedings on the eighth day of July, 1887. On the twelfth day of December, 1887, the referee filed his report, in which he found that there was no co-partnership between Murphy and Reilly, in the building of the houses for Mrs. Rogers. Plaintiff filed exceptions to the report of the referee as follows:

*First.* "The referee erred in excluding the testimony of Bernard J. Reilly." *Second.* "That the exclusion of Reilly's testimony by the referee, after the case was argued and submitted by plaintiff's counsel, under the belief by the latter that the testimony of the witness would be considered by the referee, was a surprise to plaintiff, and operated as a fraud upon his rights. That the referee, at the time the testimony was offered, decided on objection to the competency of Reilly as a witness, that he was a competent witness and could properly testify in the case; that this misled plaintiff to his prejudice. That if plaintiff had been notified by the referee of his intention to exclude this testimony, the testimony of other witnesses could have been obtained by plaintiff." *Third.* "That the finding of the referee is unsupported by the evidence."

On February 16, 1888, the circuit court overruled plaintiff's exceptions and approved the report of the referee. Thereupon a final order was entered dismissing plaintiff's bill, and the case was brought here by appeal, and plaintiff asks a review and reversal of the judgment of the circuit court for the reasons stated in his exceptions to the report.

The first witness introduced by plaintiff, to establish the allegations in his petition, was Bernard J. Reilly. Objection was made to the competency of Reilly as a witness, because Murphy, the other party to the alleged contract of co-partnership, was dead. The witness was then examined at some length, by the referee and the attorneys, as to his interest in the result of the litigation. He testified that he had no present or contingent

interest in the business and that he had made an "abso-
lute sale" of his interest in the alleged firm to the
plaintiff. Thereupon the referee overruled the objec-
tion and permitted Reilly to testify. (*Meier v. Thieman*,
90 Mo. 433.) The witness then testified to the contract
between himself and Murphy, as to the building of the
houses. That he had only received five hundred dollars
of his share of the profits, and that he had transferred
his interest or claim in the firm to plaintiff. The referee
in his report stated that the testimony of Reilly was
finally rejected by him, for the reason that the evidence
satisfied him that Reilly had an interest in the suit.
The plaintiff says "that he was surprised and prejudiced
by the final ruling of the court as to Reilly's competency
as a witness ; that if he had known or suspected that
his evidence would be rejected, that he would have
introduced other testimony on the subject of the co-part-
nership."

The cross-examination of Reilly, on the subject of
partnership and the character of the transfer to plaintiff
(as preserved in this record), was not of such a charac-
ter as to inspire perfect confidence in its sufficiency on
either issue. But when we add to this the testimony of
plaintiff as to the negotiations between him and Reilly,
and which led up to the assignment of Reilly's interest
to him, we are unable to account for the conclusion
arrived at by plaintiff, that other testimony, which he
could have introduced on the subject of the partnership,
was unnecessary. Plaintiff certainly understood that
Reilly was permitted to testify in the first instance on
the *faith* of his positive declarations that he had no
interest whatever in the result of the litigation, and
plaintiff ought to have known that if subsequent devel-
opments were of such a character as to discredit this
declaration of Reilly, and it appeared that he did have
an interest, that it would then be the duty of the referee
to exclude his testimony entirely. Under this view we

are unable to understand why plaintiff's faith in the absolute truthfulness of this declaration by Reilly, remained unshaken to the end of the investigation; and why the idea never suggested itself to his mind that the referee might finally come to the conclusion that Reilly was somewhat interested in the lawsuit, and exclude his testimony altogether.

The failure of plaintiff to introduce other testimony was, under the circumstances, an oversight of his own, and if he has suffered on account of it, he must take upon himself the blame.

The testimony of plaintiff himself, as to his agreement or contract with Reilly, concerning the assignment of the claim, is so contradictory and blind, that it is impossible to tell what the terms of the agreement really were. It seems that at the time of the assignment of this claim, Reilly was indebted to one Herman in the sum of sixteen hundred dollars. He also owed plaintiff thirty or forty dollars. In December, 1886, just after Murphy's death, negotiations were begun between plaintiff and Reilly, by which plaintiff was to substitute his notes for plaintiff's notes to Herman, as the latter had refused to carry the debt any longer, for Reilly. Herman held the title to Reilly's homestead as security for this debt and Reilly held a title bond from Herman. Plaintiff testified that he gave Herman his notes in place of Reilly's; that Herman conveyed him Reilly's homestead and took a deed of trust from him to secure the notes; that the assignment of Reilly's interest was not made to secure him on the Herman claim, but was conveyed to him in payment of thirty or forty dollars due from Reilly to him. He said, "Reilly owed me a little money for other dealings we had, and he told me if I would give him a few dollars then, he would assign this Murphy claim to me; and also, if there was anything to be made out of it, which he said would be about two thousand dollars, he would let that go towards this (Herman) claim."

In answer to a question by defendant's counsel as to the arrangement ( if any ), to transfer this Murphy claim back to Reilly after the Herman debt was paid, the plaintiff said : "That there was no such arrangement, but it should be so." Plaintiff then testified that he bought the claim for the amount of his debt and that the Murphy claim was not held as a collateral security for the payment of the Herman notes. Then the plaintiff testified : "Mr. Reilly told me some time before Christmas about this alleged claim against Murphy and stated that he was not in a condition to sue in his own name for it ; he proposed to me to do it. He owed me a little money and proposed to assign it to me temporarily at first. He said he wrote to Mrs. Murphy and said he would sue on the claim, unless she would compromise in some way. Then the claim of Mr. Herman's property came up ; first he made a temporary assignment to me, then made it in a different form as a security in case I should handle those fifteen thousand-dollar notes,—give Mr. Herman those notes and the second deed of trust and he would give the Murphy claim additional security for those notes." It is impossible from this testimony to tell what the contract or agreement really was.

Reilly testified that the consideration of the transfer of the Murphy claim was, " that plaintiff was to assume the debt of sixteen hundred dollars, due Herman and the payment of the forty dollars, owing by him to plaintiff. Yet Reilly admits that when plaintiff gave his note to Herman, in place of Reilly's note, that Herman made an absolute conveyance of Reilly's homestead to plaintiff, and that Herman took a deed of trust back from plaintiff to secure this debt. This is sufficient to discredit Reilly's statement that the assignment was made in consideration of the assumption by plaintiff of the Herman debt. Because if Reilly's statement was true, he certainly would not have consented for plaintiff to encumber his ( Reilly's ) homestead with this Herman

Morrison v. Murphy.

debt, which had been assumed by plaintiff in consideration of the assignment of the Murphy claim.

The above is a fair specimen of plaintiff's and Reilly's testimony as to the nature of the contract between them concerning the assignment of the Murphy claim. The testimony of both witnesses, as preserved in the record, is very voluminous, and it is impossible to go into the details to any extent in this opinion, but a careful reading of the record has forced the conviction on our minds, that if the transfer was made for *any honest purpose*, it was merely to secure plaintiff in the payment of the forty dollars that Reilly owed him. It is unreasonable to suppose that plaintiff agreed, as claimed by Reilly, to take this claim in satisfaction of the payment by him of the Herman notes amounting to seventeen hundred dollars; because plaintiff testified, that before taking the claim he knew it was disputed by the executrix of Murphy's estate and that he knew nothing about the genuineness of the claim except what Reilly told him. On the other hand, it is unreasonable to suppose that Reilly would consent to the absolute and unconditional transfer of a claim for two thousand dollars in payment of an indebtedness of forty dollars. Under the facts as disclosed by this evidence we think the referee did right in rejecting Reilly's testimony, and that plaintiff should have anticipated a different ruling, is, to our minds, unreasonable.

But that no injustice be done plaintiff on account of the exclusion of Reilly's testimony, we will examine the question of " partnership " in the light of all the testimony, including that of Reilly.

Reilly swears positively that there was a co-partnership between him and the deceased in the building of the houses for Mrs. Rogers and that they were to share the profits of the business equally. But we are not bound to accept this statement as true. In determining the value to be placed on positive testimony, in

any case, we must take into consideration all the surrounding facts and circumstances. The truth will always stand such a test, and is rendered more apparent thereby. In the outstart, the testimony of Reilly comes to us "freighted" with suspicion. The written contract for building the houses was signed by Reilly as trustee for Mrs. Rogers, on the one part, and by Bernard Murphy on the other. In making this large contract involving about fifteen thousand dollars, Reilly *represented Mrs. Rogers*, and yet he swears that at that time he was a *partner of Murphy in the contract.*

This is certainly a very unfavorable introduction to the chief witness, by whom plaintiff expects to establish his claim against a dead man's estate.

It does not strike the ordinary mind as being quite the proper thing for one man to be on both sides of a contract. Such action on the part of Reilly is simply indefensible. Dr. Rogers, the husband of Mrs. Rogers, testified that Reilly introduced them to Murphy and advised them to accept Murphy's bid, and that he never heard until after Murphy's death that Reilly claimed any interest in the contract. Reilly admits that he concealed his interest from Dr. Rogers and wife, but undertakes to excuse himself by saying, "that he was in debt and wished to conceal his interest in the business from his creditors, and that he was satisfied that he could properly represent Mrs. Rogers' interest in making the contract."

While we would not probably be justified in disregarding Reilly's testimony altogether, yet full credence should not be given it as to any fact, unless fully corroborated by other testimony in the case.

The testimony of Reilly furnishes no good reason why Murphy should have associated himself in business with Reilly. The latter had neither money nor credit. Murphy was a man of property. Reilly claims that Murphy was to furnish the money and he was to furnish the skill and experience in the business. The

evidence fails to show that Reilly at that time had any *experience or skill* in the building of houses, but it *does* show that Murphy was an old contractor. What advantage could Murphy derive by taking Reilly into his business and sharing equally with him the profits? If a loss had occurred, Murphy would have been compelled to pay it all. Reilly undertakes to avoid this difficulty by saying that Murphy was in bad health and he needed some one to look after the work. But how are we to reconcile this statement with the testimony of Hugh Redmond, one of the plaintiff's witnesses, who swore that he, at the request of Murphy, had personal charge and supervision of all the work, during Murphy's absence. Murphy gave the business his personal attention, except during a spell of sickness, which lasted about two weeks.

There is another circumstance developed by the testimony that it is not satisfactory to us. The houses were finished in April, 1883, and Murphy died in November, 1886. During this time Reilly was hard pressed for money and was harassed by a horde of creditors. He admits that during the three years and six months that Murphy lived, after the completion of the work, he never asked him for a settlement. He said that his contract with Murphy was very secret and that all of their negotiations were carried on behind "closed doors;" that this was done because he (Reilly) feared interference on the part of his creditors if his connection with the business was known. That there was no written evidence whatever of the contract, and that during the time Murphy had several spells of sickness of which he (Reilly) was apprised, and that the last sickness of Murphy was of several weeks duration. All of these facts made it quite necessary for Reilly to either have a settlement with Murphy or get from him some definite statement or evidence of his rights in the alleged co-partnership. Reilly undertakes to explain his failure to call on Murphy for a settlement or get

some evidence of the contract by saying, "that he did not want to insult Murphy." Just why this would have been a just cause of offense to Murphy we are at a loss to understand. All of the witnesses, including Reilly, agree that Murphy was an honest and fair man. Then he would at any time have readily accorded to Reilly his just and legal dues. If the profits of the business were tied up in the Finney avenue property, as claimed by Reilly, then Murphy, as a reasonable man would have given Reilly some written evidence of his interest in the property. The excuse or reason offered by Reilly for not calling on Murphy for an adjustment of their partnership business is not worthy of belief. We have a great deal of faith in humanity and are inclined to believe what is positively asserted under oath to be true, but there is a limit to this. We must draw the line at some place.

There is another circumstance in this case which to us is of much significance. All of the evidence in the case shows that Murphy was very honest and conscientious in all of his dealings. Reilly states this many times in his examination. If Murphy was an honest man he would not have concealed from Mrs. Rogers the fact that her *trustee* was his *partner*, in her contract with him for building her houses. It is useless to carry this discussion to any greater length. The record furnishes abundant evidence of the unreliability of Reilly's testimony.

There was some other evidence in the case bearing on the question of partnership but we do not think it is sufficient to establish the issue in favor of plaintiff. It seems that during the building of the houses, Reilly was assisting Murphy in conducting the business. Dr. Rogers said that Reilly was a clerk or collector for Murphy and that he never heard anything about a co-partnership until after Murphy's death.

Hugh Redmond testified that he heard Murphy ask

Reilly how much he expected to make out of the build-
ings. Reilly said that he thought he would make about
three thousand dollars, etc. The following question
was asked Redmond:

"Q. State whether you heard any talk or heard
Murphy say anything in Reilly's office in regard to
Reilly's being interested with him in the business."
"A. Well, he simply stated, 'if we get through all
right that they were to divide the profits.' That
Murphy did not say in what proportion the profits were
to be divided." If all the facts and circumstances
established by the evidence tended to support this state-
ment by Redmond, we might be warranted in finding
the issue for plaintiff, but even this would be doubtful.
It was but a loose declaration by Murphy and probably
not intended by him to convey the idea that Reilly was
his partner within the legal acceptation of the word.
It appears from the testimony of this witness, that
Murphy was induced to undertake the contracts at the
solicitation of Reilly, and it might have been agreed
between Reilly and Murphy that the former should
assist in the management of the business and receive as
his compensation a per cent. of the profits. Reilly
admits that Murphy paid him five hundred dollars, and
that amount may have been his compensation.

The witness McGinley testified that Murphy told
him in the presence of Murphy's wife and daughter and
son-in-law, that Reilly was his partner in the building
of the houses for Mrs. Rogers. In this he is flatly
contradicted by Mrs. Murphy, her daughter and son-
in-law.

We have gone through the record in this case with
a great deal of care, and we are convinced that the judg-
ment of the circuit court is for the right party and ought
to be affirmed. There is a question of jurisdiction in
this case which was not raised at the trial, or suggested
by counsel in their briefs. It is a matter of great doubt

whether the case at bar can be distinguished from that of *Ensworth v. Curd*, 68 Mo. 292, where it is held that original jurisdiction in this class of cases rests with the probate court. As the judgment of the circuit court was for the right party, we have not deemed it necessary to pass on this question. *Fletcher v. Keyte*, 66 Mo. 285. Judge ROMBAUER concurs in this opinion, and Judge THOMPSON concurs in the result.

THOMPSON, J., delivered a separate concurring opinion.

I concur in affirming the judgment of the circuit court dismissing the suit, but only on the ground that the circuit court has no jurisdiction of this action. This conclusion is unavoidable, in view of the decision of the supreme court in *Ensworth v. Curd*, 68 Mo. 288, which was a case in all respects like the present case, with the single exception that in that case the power of the probate court to sell real estate belonging to the alleged partnership was distinctly invoked; while in this case the plaintiff seeks to work out the same result, by charging what he claims to be due him upon the assets in the hands of the administrator of his alleged co-partner. In other words, in that case the surviving partner sought, by a suit in equity against the administrator of his deceased partner, to attain precisely the same result which is sought in this case, but invoking on the part of the circuit court the exercise of larger powers than are invoked in this case; so that, if no jurisdiction existed in the circuit court in that case, none exists in this case for stronger reasons. See also *Caldwell v. Hawkins*, 73 Mo. 450. Although this question of jurisdiction has not been raised by either party, we are none the less bound to take notice of it by our own motion, as it relates to jurisdiction of the subject-matter of the action. As this question of jurisdiction lies at the threshold, I decline to express any opinion as to the merits; although I have no doubt, on looking over the printed arguments, that the same result would be reached on the merits.